May it please the Court, I'm Anne Ball, representing Appellant Geraldine McFadden. In this case, we are, of course, asking this Court to connect many dots which we think are readily connected if inferences are drawn in favor of our client. We think that in the Court below, in order to reach the result it did, the Court drew all inferences against her. We think that this case is best understood by seeing this as a case of age discrimination which actually contains a case of religious discrimination under Title VII and also a case under the ADA. The initiation where we think as a part of institutional strategy, the RTC initiated the course of action which we call age discrimination when a sham promotion was set up, whereby Ms. McFadden was competing essentially against some other employees of the RTC who, in fact, were not really in the running. She was given a job which was presented to her in the light that it was a promotion. It turned out to be the same work she had been doing before, but now she had lost her job tenure which she had acquired over a 7-year period, actually acquired by virtue of having worked for the agency for a year, and then she had been there for another 6 years. Now, with the so-called promotion, which wasn't a promotion, she could readily be fired without the right to arbitration which she would have had. The theory is she was promoted into a position so that she got probationary status and such. Correct, Your Honor. So that they couldn't so that they could fire her without a hearing from that position. Yes. Is there any, is there anything in the record to support that pretextual, assertively pretextual, quote, promotion? Yes, Your Honor. The job that she was so-called promoted into was created for her as soon as she was fired. The job was abolished, although later on there was another job with the same job title. It was, by admission of the agency, it was a totally different job. So the promotional job was created simply to promote her into it. And then once she was in it, her work was the same, with very few exceptions, as it had been before. Her work, the actual job description, which is on the record, the actual job description for the job she was promoted into contains many aspects which she had not been previously been doing. But none of those aspects, which we might call a little bit more on the side of professional marketing work, none of those were actually assigned to her. So before this so-called promotion, she was doing clerical work at her computer, answering telephones, filing, and doing word processing and a little bit of statistical work with Excel. And after the promotion, she was doing, for all intents and purposes, the same tasks. She was also occasionally driving to distribute bus pass tickets to various employers in the Reno-Sparks area. So we think that that is a very strong piece of evidence of pretext. And that's really two pieces, the fact that the job was created and then destroyed, and then the fact that the job did not contain any elements to speak of. That she had not been doing. Kagan. Ginsburg. My understanding is that the reason why she was ultimately discharged was because the at least one reason is because the employer thought there was more to the job and that she wasn't doing it. That, Your Honor, I think that it's pretty clear on the record that she was not assigned those things to do. And another thing that I think that we have demonstrated is that with the things she was assigned to do, she had more than enough to fill every moment. So there's actually no way she could have been assigned to do those things. Well, she did not appeal the termination. Is that? Did she have any recourse? That is correct, Your Honor. What remedies were available to her to appeal that? She had no remedies. As a probationary employee, she had no remedies. When she lost her job, she had no appeal. As an employee, an ordinary, full-fledged employee of the RTC, she had the right to arbitration, as Mr. Morse stated in his testimony. But she lost that right. And it was an interesting situation inasmuch as the probationary period of a year was extended by means of another disciplinary action against her, a disciplinary action which we think was also a sham, which slightly extended that year. Did she ever ask for her old job back? Her old job no longer existed. It wasn't as though someone else had been put into her old job. And no, she did not. I'm trying to understand. She was terminated and then she filed discrimination charges with the EEOC. She actually filed those, Your Honor, before she was terminated, I believe, if I remember correctly. Before she was terminated? Yes. On the basis of? A number of things occurred during the course of the last months of her employment. During the last month of her employment, events occurred which we think present even under the older law a claim for regarded as disabled, where she was essentially forced to go into a psychological counseling situation. She was removed from the workplace, and she was – it was made clear to her that if she did not go along with these people and go to where they were taking her, she would be disciplined for insubordination. And she knew that discipline in that instance would cause her the loss of her job. What category of disability does that fit? The category of disability that that fits into, we are alleging because we're arguing this under the older law, although we think this might be an appropriate instance for looking at the newer law and seeing whether that should be applied. This falls into the category of under the older law, we would say, she's alleging that she was disabled from working because not only did they remove her from the workplace, but they kept her out of the workplace for a sufficient number of days afterwards. So the impression was created throughout this workplace, which is a fairly small agency, that there was something the matter with her mental health. Doesn't disability have to have some temporal element? Doesn't disability have to persist for some period of time in order to qualify as a disability? Or to be reasonably, under the older law, to be reasonably anticipated to extend for a certain duration of time. What actually happened here is that at the time that, at the time that this person was escorted out of her workplace, there arguably was some lessening in her mental acuity because she had had an automobile accident recently. She was on doctor's prescriptions for a number of pain medications. She was observed and known by higher-ups in the company to be groggy at work. She had returned after a three-week absence because of the accident and had been back in the workplace for a couple of months, but heavily medicated when this occurred. And there's an implication because of the way she was fired that even at the time of the firing, Pearl, who we allege was the perpetrator of a number of actions against McFadden which were motivated by religion animus. We allege that Pearl had religion animus against McFadden, who was a Catholic who demonstrated some elements of her religion in the workplace, typically. Yeah. So the Pearl letter to the head of the agency, Krauss, which essentially asked for the termination of McFadden, the Pearl letter basically is setting forth aspects of McFadden's work which, if true, and we think they were not, but if true, they were caused by the fact that she was still medicated and not feeling well. Because this was somebody who had a record with the agency for a clerical worker, which is all that she was. She had a great record over a seven-year period. In fact, on the record is the bus company, which is part of RTC. The bus company's manual, the bus company's manual for OSHA, which is quite lengthy and technical, was given to Geraldine McFadden to write on her own at home after hours because the agency had forgotten to prepare it and they needed to get one ready in a hurry. She was such a good writer, they simply sent her home and asked her to write the manual. Now, she was in the midst of writing that manual and she was very happy to do so because she was being paid overtime for doing that. Pearl, we think through no reason then animosity, took her off that project. Now, Pearl was over her. Nancy Pearl was over. And I do want to reserve a couple of minutes if I can. Nancy Pearl was over her. It was not Nancy Pearl who had assigned Geraldine McFadden to do that OSHA manual. No, that had been assigned to her by somebody in a collateral branch of the agency. And Nancy Pearl, through no motivation, we think, except for animosity, religion based, took her off of that project before it was finished. What do you brought? There are a number of different theories that you are arguing. What do you think is your strongest theory? I think my predominant theory, I don't want to say my strongest, Your Honor. I think my predominant theory is one of age discrimination because that's the institutional reason for this. The other theories are contained in this and they have to do with motivations and animosities that persons employed in the agency had that were above McFadden. But this was not the institutional motivation. This was the cat's paw. This was what we might call the so-called cat's paw, the LaFontaine fable, wherein Mr. Krause is the monkey and Ms. Pearl is the cat, and Mr. Krause knows that the agency wants to bring in perhaps younger people at a lower wage, and he is very aware of the religious fervor and animosity of Ms. Pearl because Ms. McFadden has brought that to his attention and the attention of others. He essentially uses the animosity of Pearl to do his work for him, but the monkey is smarter than the cat, so after Pearl has done this, then she is fired. Thank you. You have about two and a half minutes for rebuttal. Good morning, Your Honors. May it please the Court, my name is Dora Lane. I represent the appellees, Regional Transportation Commission's Gregory Krause and Carolyn Robinson. With me at the table is Ms. Rebecca Bruce. She represents the appellee Nancy Pearl, and I would like to reserve three minutes for Ms. Bruce's argument. Before I address the reasons why Ms. McFadden's appeal has no merit, I'd like to focus on the individual appellees first, and that's Mr. Gregory Krause and Ms. Carolyn Robinson. The only possible cause of action alleged in the appellant's brief as it relates to these two individuals is the substantive due process claim. That claim is really, really weak with respect to Mr. Krause because Ms. McFadden admitted in her opposition to our motion for summary judgment that Mr. Krause was not even aware of the events of the alleged May 30 incident when they were taking place. He was away from the premises and did not have knowledge of that whatsoever. In her reply brief, counsel has argued that Mr. Krause perhaps should have prevented the subsequent administrative leave on which Ms. McFadden was placed. That is completely redefining the substantive due process now being alleged because the alleged fundamental right now being implicated is the right for Ms. McFadden to not be placed on administrative leave while her employer ascertained that she was able to safely drive. No such right has been recognized, and Mr. Krause simply cannot be held responsible for an alleged violation of substantive due process. I will address Ms. Robinson's involvement in the context of RTC as well. But first I want to turn to the predominant claim that Ms. Voll has now advanced, which is the age discrimination claim. This claim, the curious part is that Ms. Voll advances the theory that this is an institutional bias. She has not identified specific actors who allegedly perpetrated this bias, and she cannot do that. Her own client, Ms. McFadden, has admitted that the main actors in her termination, which were Mr. Krause, Ms. Pearl, and Ms. White, who actually authored the performance reviews based on which Ms. McFadden was terminated, had no bias toward her based on age. Ms. McFadden admitted there was no evidence whatsoever that anything they undertook against her was based on age. So it is very difficult to fathom that anyone else who was not involved in the decision or preparation for termination of Ms. McFadden, as Ms. Voll classifies it, was in any way involved other than these three folks. In addition, the recent U.S. Supreme Court pronouncement in Gross v. FBL has now clarified that the proper test for age discrimination is a but-for test. Even though, even under the old test, Ms. Voll still cannot – I'm sorry, Ms. McFadden still cannot meet the requisite elements. Now there is this higher standard, and it's a but-for test, and there's simply no evidence to establish that anything RTC did was based on age discrimination. Kagan. Kagan. I'm sorry. Summarize for me why Ms. McFadden was fired. Yes, Your Honor. Ms. McFadden was fired due to performance issues that dated back to November or so of 2002. That was before her accident. She was not timely and accurately completing the Bass Pass advertising and past sales tracking reports, which was a significant part of her job. In fact, that was worth about over a million dollars. In addition, there were issues with her challenging authority or being unwilling to assist her coworkers. Her peer reviews speak to that as well. There was no one specific reason why she was terminated. It was the cumulative effect of her inability or unwillingness to properly complete the spreadsheets that were a major part of her job, her unwillingness to assist and work with coworkers. The fact that she had represented that her spreadsheets and work product was complete when, in fact, it was not complete, that was also a significant part. So it was just varying performance issues. And was there also an issue about computer use? Yes, there was, Your Honor. However, that was not the reason for her termination. What happened was, in March — I'm sorry, while Ms. McFadden was gone due to her accident in February and March, Ms. White, who was her supervisor, had taken over, along with others, some of Ms. McFadden's duties. And she determined at that point in time that Ms. McFadden had not completed her spreadsheets or other reports for over seven months or so. At that point in time, Ms. White had observations that she had seen Ms. McFadden use the computer on work time, and she felt that Ms. McFadden was not using her work time wisely, although she reported work on RTC projects, which precipitated a search of Ms. McFadden's computer. And it was not only on her computer, it was a department-wide search of computers. That search revealed that Ms. McFadden had, in fact, spent over 60 hours on the Internet since February of 2002, and about 45 of these hours were spent between October 2002 and November. So, as a result of that Internet use and the fact that Ms. McFadden had reported actually working on RTC projects during that time, an additional issue was that Ms. McFadden had used RTC equipment on non-work time for personal purposes. These various violations were what caused the write-up for improper use, but that specific write-up was not the basis for her termination. This went off on summary judgment. Yes, Your Honor. Is that correct? And the documents that you put in on summary judgment were what? The showing that was made by the defendant. The documents with respect to the HC. The reasons for her termination. The reasons for her termination were the performance reviews. No, I understand that. Was there – I don't – for some reason, I don't have the excerpts here. So, did you submit affidavits or what? We did. We submitted multiple affidavits. We submitted her performance reviews. We also submitted – The performance reviews were there. Correct, yes. And did – the plaintiff's claim appears to be the crux of it for this purpose is that the promotion was a sham. Was there any evidentiary showing on her part affidavits or showing of documentation or statements of other employees that would relate to the sham nature of the promotion? Ms. McFadden submitted her own affidavit and then the belated affidavits of Karen Hanna and some other employees. The only one that might tangentially touch on the issue is the affidavit of Karen Hanna, who is another terminated RTC employee. And Ms. Hanna was a temporary employee who worked in the finance department and she was purporting to attest to what finance was doing months after Ms. McFadden was terminated. So in addition to being – So there was no affidavit of an employee, any other employee who was present at the time that these things happened? No, there was none, Your Honor. And if I may elaborate on the point of the promotion, there has been no evidence whatsoever that that promotion was targeted toward Ms. McFadden. In fact, the position was posted twice. The first time it was posted in August of 2001, before Ms. McFadden was over 40. So this alleged sham promotion cannot in any way relate to her age. It was also posted when it was posted for the first time as open recruitment, so anyone could have applied, not just folks who were within the agency. In addition, it was posted in April of 2002. And she applied for it? She did. She did apply. And in fact, in her deposition, she testified that she applied for it knowing that it carried with it a probationary period, but she wanted it because she saw it as an opportunity for advancement and she wanted more money, which is why she again reapplied in April of 2002, along with three other employees of RTC. Ms. McFadden is attempting to link Ms. Pearl's alleged religious or age bias or so to the position. However, the only admissible evidence on the subject came from Ms. White, who was Ms. McFadden's supervisor. Ms. White testified that the reason why the position was necessary is because RTC had done so well in growing the bus pass programs that there needed to be someone who was fully dedicated to that job to keep track of them and to grow the program, in addition to some other duties. So that is why Ms. McFadden was offered the opportunity to apply for that position. As for age bias, I just want to point out that Ms. Pearl was 54 years old at the time, Mr. Krause was 46 years old, and Ms. Robinson was 49 years old. All of these individuals were older than Ms. McFadden, which makes her claim that they engaged in age bias completely unlikely. Okay. Thank you. Are there any further questions? All right. Thank you. Thank you, Your Honor. May it please the Court. Rebecca Brewer on behalf of Ms. Nancy Pearl. The only claims that are related to Ms. Pearl are the two due process claims, the substantive and the procedural due process. Ms. Vole very accurately described what you have to do here today is, as she described, connect many dots. And borrowing from the Twombly and the IDAC standards, those dots do not connect. She cannot nudge this from conceivable to plausible. In order to do that, you have to believe that RTC and Ms. Pearl concocted this. Those are pleading cases. Was your client dismissed on a pleading? No. No, it was not. And, yes, I recognize that that is a motion to dismiss standard and not a summary judgment. But at that level, there has been no discovery done. And so I would argue that at this point, all of this discovery is done and none of those dots still connect. And it is still not plausible. The theory that Ms. McFadden has placed before this Court and that Judge Reed found not to be believable. In order to overturn Judge Reed, you're going to have to find that RTC and Ms. Pearl concocted this elaborate plan, concocted, created a position, and lured Ms. McFadden to apply for it. And as part of that, that they could conceive that she was going to get in an auto accident and then she was going to come into work on a day when she called in sick, she shows up disheveled, and now they're going to force her over to an EAP facility. And I would just argue to you that that is not something that connects the dots, as Ms. Bohl has represented, that you need to be able to do. The EAP visit was directly related to health, safety of the public and Ms. McFadden herself and her coworkers. And I would also argue that she was, that there was terminating, that the, sorry, I was expecting you to ask me a question and so as I get on my roll, and I'm waiting, anyway, I would argue to you that the fact that she was, that that is just a leap that could, is not possible to be taken in this particular case. The only other thing I wanted to correct, another dot that does not connect, is that Ms. Bohl argued that after all of this, Ms. Pearl was terminated as if that dot connects to Ms. McFadden's situation. And that was simply not the fact, not the case. There was multiple testimony from multiple people. Ms. Pearl's termination had nothing to do with the way that the McFadden termination was done. So with that, if you have any questions, I'm happy to answer those. I appear to be in. Thank you. Thank you. I'd like to point out, I neglected to mention, that in the affidavit of Mr. McGrath, which is on the record, he states that he knew, before the competition was even started for this so-called promotion job, that McFadden would be put into that. He knew because he had been told. But that all sounds as if somebody was trying to help her out and get her a better job. Well, it all sounds very benign. But when you see what happened on that particular date in 2002, in the context of what happened in 2003, it's not, it's not benign at all. Now, the very important document, certainly, is the so-called separation report, where Nancy Pearl writes a letter to Greg Krause just before the firing, explaining why it is that she wants Geraldine McFadden to be fired. And in this, it's interesting for several reasons, but the most so because she states why it is that the job was created into which Pearl, into which McFadden was placed. And she is saying it was needed to monitor because of the growth of the bus pass program. Yet we have a document, which is Hour 5.1, showing that the bus pass program was level in those years. This is a graph that went to the state and federal transportation departments. The promotion. What evidence is there that anybody was discriminating or wanted to discriminate against Ms. McFadden on the basis of any of the — the disability issue was certainly off the table because it hadn't happened yet. So the disability issue hadn't happened yet. So presumably there was no disability animus at that point. So what are you claiming there was? There was age animus at that point? At that point, yes, Your Honor. We think that there was. When the job was created, she wasn't even 40, right? Sure. The age that she turned was 40 at that point. In the middle of — after the job was first created, but not failed, and then it was failed after that. The job — she turned 40 and the job was created just about at the same time. So what evidence is there that at that point somebody was — had an age bias animus against her? Certainly she was treated differently. Certainly she was treated differently before she turned 40 and after. But there is evidence that she was the first of a number and that this happened with a string of clerical workers. And I believe that at the time they were encouraging these people to go to college, and at the time there was a sort of a movement, go to college or upward or outward, so to speak, for a certain group of women of which she was a part. But that doesn't sound like anybody's trying to do them in. So what evidence is there that somebody was trying to get rid of? To get rid of her. At that point, before she got the job, or when she got the job? When she got the job. Before she got the job, she was only treated handsomely. She had had some minor unhappiness with Ms. Pearl in terms of being asked to remove this or that from her office. It was not a substantial problem. After she was promoted into the new job, she was not treated well again. She was put into the job and then was treated poorly thereafter. She was treated particularly poorly when she was out for her accident and after she came back. They did not follow their usual procedure of having a temporary worker who could fill in for her while she was away. So she came back to work feeling ill, having to do the past three weeks' work and the current work. There is some evidence that she never got really caught up until she was fired. Okay. Thank you. You've used your time. Thank you. The case just argued is submitted for decision.
judges: Shadur, Schroeder, Berzon